RECEIVED

APR 0 7 2011

AT 8:30_____M
WILLIAM T. WALSH, CLERK

Mark C. Meade

PRO SE Plaintiff

5 HERITAGE RD.

FLORHAM PARK, NJ 07932

CASE No. ~~2:22-cv-00900~~

DMC 11-cv-900

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

Mark C. MEADE

PRO SE PLAINTIFF

- V-

KIDDIE ACDEMY DOMESTIC FRANCHISE, et.al.    CASE No. 2:11-cv-00900 DMC

(KADF) DEFENDANTS

Eric Tractenberg ESQ., NIXON PEABODY 437 Madison Ave. NY NY 10022

PLAINTIFF'S COUNTER – MOTION IN OPPOSITION OF DEFENDANT'S

MOTION TO DISMISS, MOTION DATE April 7, 2011

_[signature]_

b.s.

Plaintiff respectfully requests Defendants motion be denied and the case before the court proceed to trial.

In answer to Defendants Motion:

I: Standing and Venue:

1) Defendant Attorney claims that Plaintiff is not the franchisee and thus has no standing. This is false, in YORK CHRYSLER – PLYMOUTH v. CHRYSLER CREDIT CORP. 447 F 2d 786 5th Circuit (1971) the court held" individuals could bring claims where the franchise agreement explicitly made them essential to the operation of the franchise." By KADF'S own requirement in the franchise agreement, plaintiff is required to, under MANAGEMENT of ACADEMY, page. 18, section, 6.18, require franchisee, (if corporation the principle of the franchise), "must also devote adequate energy and efforts to the management and supervision of the academy…" "spend at least thirty (30) hours per week at the franchise, I spend sixty hours per week plus a ninety minute commute each way. Therefore plaintiff has the status of "essential personnel" and has standing to bring suit as described in the YORK case.

2) Under Article III of the Constitution Federal Courts have jurisdiction under the "Cases and Controversy" Clause. Jurisdiction is attached as Plaintiff has met the "irreducible minimum" requirement that: 1)Plaintiff suffered injury. 2) That injury is traceable to the defendant. 3) The injury would be remedied by a favorable ruling by the court.

VALLEY FORGE CHRISTIAN COLLEGE v. AMERICANS UNITED for SEPERATION of CHURCH and STATE 454 U.S. 464, 472  (1982)

GLADSTONE, REALTORS v. VILLAGE of BELLWOOD  441 U.S. 91,99 (1979)

SIMON v. EASTERN KENTUCKY WELFARE RIGHTS ORGANIZATION 426

U.S. 26,37 (1976)

3) In the SCOTT case (1973) determining standing it was held, "the court cares about what sort of interest is sufficient for the plaintiff to be regarded as a proper party bringing the action". Plaintiff meets that standing requirement, also as demonstrated in the principle of "PRUDENTIAL STANDING" whereby I meet the criteria established in that I was directly affected by actions of the defendant's;

A) Plaintiff suffered actual injury

B) The injury is traceable to the defendant

C) The injury would be redressed by a favorable decision.

I have suffered actual injury as I have lost all income and my entire life savings, because of the actions and conduct of the defendant's. I also have HOFELDIAN RIGHTS; where reciprocation is paramount, KADF has the correlative duty to abide by the promises of the agreement. Equity will not allow a right to exist without a remedy.

Among other issues that plaintiff wishes to address at trial, is the  KADF et. al. Breach of Contract in that KADF et. al. failed to;

1) Assist in finding a location.

2) Assist in lease negotiations.

3) Provide training and support.

4) Assist in all phases of construction from beginning to opening.

5) Assist in the installation of required equipment and furnishings.

6) Assist in advertising

7) Did require purchases of preferred vendor's inferior goods at greater prices that better quality items available at retail.

8) Did misrepresent territories available

9) Did make false earnings claims, and misrepresent working capital required.

10) Did obtain an SBA loan using fraudulent documents and representations.

As many and several of the violations perpetrated by KADF involve transgressions of federal law and rule.

3) Again plaintiff has standing as KADF is considered by the Securities Act of 1933, 1934, a "security". When KADF offers a prospectus they become a security subject to the laws of the "SEC" a federal agency. As such plaintiff has standing under ARTICLE III of the US CONSTITUTION. Initially as plaintiff and defendant are from different states and hence standing is granted under the diversity right, and additionally as in the SEC v. W.J. HOWEY & Co. a franchise is deemed a security, similarly in BLACKWELL v. BERTSEIN a franchise is deemed a security, and in the SEC v. ADDISON the court goes further and rules owners and workers are designated as investors and have the right to seek redress of grievances in the courts. Under Article III the court exerts jurisdiction in cases arising out of federal statute. In "THE FRANCHISE AGREEMENT AS A SECURITY" 24 bus. Law 1311,1316-17, the NLRB and sections of the WAGNER ACT regard the franchisee as an employee.

The right of plaintiff to bring suit in this case is established and guaranteed by the aforementioned. As a security the SEC encourages private individuals to bring suit where violations occur and act as a "private attorney general", (18 USC 1964) "must advance the policy inherent in public interest legislation", that also gives the plaintiff standing. It is the clear intent of the legislature to enlist the help of private citizens to compliment the federal enforcement of SEC rules. And again federal Judges interpret any act proceeding from a legislative body. The right of plaintiff to sue and the court to exercise authority over this matter is clear, and what legislation sought to enact by expanding the scope of the SEC through participation of private citizen's in furtherance of providing protection in public policy. Similarly in the EQUAL ACCESS TO JUSTICE ACT section 17204 grants standing, by any person acting for the interest of itself, its members, or general public. Plaintiff is acting for itself with the hopes of benefitting the greater class of franchisees in this system.

4) The 1946 ADMINISTRATION PROCEDURES ACT bestows standing to anyone aggrieved within the meaning of the relevant statute.

5)  Indeed KADF recognizes my standing as an individual, in the franchise agreement KADF specifically mandates that for purposes of the agreement the individual and the corporation have the same standing and are by contract, interchangeable and regarded as one and the same. On page 70 of the franchise agreement under "Personal Guaranty" KADF writes, (2) "agrees to be personally bound by, and personally liable for the breach of each and every term, provision, agreement and covenant contained in the Franchise Agreement, AS IF he/she/they were the original franchisee thereunder.  And further proof is in the lawsuit filed

against me in Maryland State Court, in Harford County, Case no. 12-C-11-000086 CN. In that suit I am sued as an individual, not the corporation, demonstrating the KADF intention of viewing both the individual and corporation as interchangeable thereby having the same rights as well as the unilaterally imposed obligation.  KADF rejects the arbitration clause, on the CIS document filed in Maryland Court, in the section stating "is this case appropriate for referral to an ADR process, (check all that apply) B. Arbitration is checked NO," and went *Exhibit A* straight to a personal suit. It is also telling that KADF has not participated in the DASODA CORP. Chapter 11 Bankruptcy court proceeding that began in September, 2010. That is case number: 10-139528-NLW in the US Bankruptcy *Exhibit B* Court, District of New Jersey. KADF made no motions for relief from stay nor attended any of the creditor conferences. Recently KADF has filed a motion in the Bankruptcy Court to force me and my company into Chapter 7. That motion is scheduled for Apr. 11th, 2011. This would cause the termination of 17 employees, and the loss of my business and the subsequent financial ruin. Certainly the acts of fair dealing and good faith are absent from this franchisor's lexicon. It is an important case for the court to hear on many different levels. For example.

6)  United States Code: Title 15, 2805, supports the franchisee as it seeks to eliminate unilaterally imposed contracts of adhesion. Section (f) release or waiver of rights;

1)  No franchisor shall require, as a condition of entering into or renewing the franchise relationship, a franchisee to release or waive—

A)  any right that the franchisee has under this subchapter or other Federal law: or

B)  any right that the franchisee may have under any valid State law.

2) No provision of any franchise shall be valid or enforceable if the provision specifies that the interpretation or enforcement of the franchise shall be governed by the law of any State other than the State in which the franchisee has the principal place of business of the franchise.

7) This is clear language and an intent to grant a plaintiff such as myself their "day in court". These statutes have been created to prevent the abuses of franchisors. As in this case the franchise agreement constitutes an "ILLUSIONARY CONTRACT" it is so one sided that one party has to do nothing but collect its money. I entered into this unconscionable contract without the benefit of counsel, and thereby I lacked a meaningful choice as to the inclusion of the challenged provisions, and that provision unreasonably favors the other party, namely KADF et. al.. The Federal Trade Commission Act (15 U.S.C. && 41-58) promulgated the rules based upon its finding of" prevalent deception in the offer and sale of franchises leading to significant consumer injury. That franchisors may misrepresent the promised assistance, pre-opening assistance as well as ongoing assistance. That false and unsubstantiated financial performance claims have been prevalent in fraudulent sales". This is what my lawsuit alleges the same things legislatures, commissions, and state and federal laws are trying to prevent and eliminate. These are not groundless allegations not elucidated to the satisfaction of defense counsel, but a movement toward a more level playing field, that is what I seek in this suit, equity under the law, where all parties are afforded equal protection. The franchisors seek to disregard the welfare of the franchisee and

when broke and bankrupt, usually through the misrepresentations and fraudulent inducement, to deny the franchisee their day in court by hiding behind agreements that are unfair and as in In Re RICOH CORP. 870.2d at 573-4, referring to forum selection clauses the court must consider whether the clause was fairly negotiated by experienced business professionals and whether there was fraud, duress, misrepresentation, or other misconduct in connection with the agreement to the forum selection clause. I am an inexperienced business person and this was my first venture into franchising and the child care arena. KADF exerted constant pressure for me to sign. This pressure was exerted by Susan Wise CFO and Bill Enders COO and Michael Miller CEO, consisting of the earnings I would achieve, the financing they would obtain for me and their expertise and experience I would be able to avail myself of in the course of the franchise process, and how this was a great time to act as the child care industry is constantly expanding. I was induced fraudulently to enter into this contract without realizing the import of many of the provisions.

To refer to the FTC/UFOC guidelines forum selection clauses must be prominently displayed, in bold type and capital letters, this was not done, the KADF franchise agreement buries this clause on page 65, section 26.2 and again on page 66 section 27.1 of a 68 page document, clearly this is easily missed and the consequences not understood by me. Many states have also passed legislation and Acts to eliminate these abuses. New Jersey is one such State.  There was no meeting of the minds and granting the motion to dismiss would be missing a great opportunity for the court to protect the franchisee and further the intent of legislative bodies.

8) New Jersey has enacted the New Jersey Fair Practices Act, (Franchise Act), and again New Jerseys goal and motivation is the same as the FTC's, namely to stem the proliferation of unfair dealings by the franchisor. New Jersey requires those offering franchises for sale within the state to comply with the NJFPA rules. In KUBIS & PERSZYK ASSOCIATES v. SUN MICRO SYSTEMS 146 N.J. (1996) the court in it's ruling held, "forum clause will not be upheld unless the Franchisor can prove the clause was not imposed as a result of the Franchisors' superior bargaining power through evidence of specific negotiations over inclusion of the clause in exchange for concessions to the franchisee which show the clause was not imposed against the franchisee's free will". In INSTUCTIONAL SYSTEMS v. COMPUTER CURRICULUM CORP. 130 N.J. (1992) the court disallowed forum selection clauses. Many States prohibit such clause as New Jersey does, for example in NEIGHBORS v. LYNN HICKEY DODGE INC. No. 85-676 at 9 (Okla. Cty. App. 8/6/96 JA at A III, A 119) that court held " because of the special guarantee of jury trials granted by our constitution that a contractual provision purporting to grant a unilateral right to elect alternative dispute resolution procedures is not enforceable against the party demanding a jury trial". In MASSEY v. FARMERS INC. GROUP 387 P. 2d 880 884 (OKLA. 1992), the court held, " One party may not unilaterally decide to have someone other than a jury determine the issues and thereby destroy the other's right to a jury trial". ALPHAGRAPHICS FRANCHISING INC. v. WHALER GRAPHICS, 840 F Supp. 708 ( D. Ariz. 1993) The court held the franchisor failed to inform the franchisee of it's intention to insist on enforcement

of the forum selection clause if a dispute arises and hence no meeting of the minds". As part of my obligation to KADF, I was required to attend a two week training session at KADF headquarters, at no time was the forum selection clause mentioned in a training specifically designed to inform the franchisee of the corporate policy and company procedures. New Jersey and many States are trying to eliminate the widespread practice of forum shopping, the unconscionability of which shows "one party lacked a meaningful choice as to the inclusion of the challenged provision and that the provision unreasonably favors the other party". Indeed all such clauses are a disingenuous ploy to deprive a plaintiff such as myself the rights guaranteed by state and federal laws. The New Jersey Franchise Practices Act, N.J. 56: 10-1, et. seq. was enacted to level the playing field. KADF et. al. has agreed to be governed by the act by registering and/or offering franchises for sale in N.J.. The act governs and thereby pre-empts the franchise agreement. The franchisor cannot deny a N.J. franchise the protection afforded by the act by merely stating that another state's law will govern the act. A franchisor is also bound by the N.J. Consumer Fraud Act, N.J.S.A. 56: 8-1 et. seq. which requires the franchisor act in good faith and fair dealing. This has not been the case with KADF, et. al.

II) Plaintiff's Inadequate Pleadings and the Standards of Fraud;

    1) Plaintiff has filled out the civil cover sheet. The instructions are clear and tell the plaintiff to make a brief statement of relevant facts without elaborating or going into detail. And indeed space is very limited. Plaintiff was following the instructions.

2) Indeed in the preceding paragraphs plaintiff has gone to great lengths to elucidate the vast and many transgressions perpetrated by unscrupulous franchisors. With so many state, (NJFPA) and federal, (FTC) laws specifically enacted to prevent the actions plaintiff has brought in this suit it is a common sense conclusion plaintiff is referring specifically to real and actual facts and situations. To further demonstrate facts I will give examples and documentation and/or amend the compliant as the court determines.

A) In the current Kiddie Academy "Franchise" advertisement they state KA provides thorough support in the following areas: Site Selection.   Exhibit C

KADF et. al. provided no such support for me thorough or otherwise. I was told locations were available only in Burlington or Ocean County NJ. This statement was made by Joshua Fricke, V.P. of real estate, and Site selection specialist. Mr. Fricke stated that in his capacity as site selection specialist he had studied the Ocean County, NJ demographic and identified Jackson, NJ as an excellent location for an academy based on his demographic research. This was in the time period of Aug. to Sept. of 2006. Christopher Cammorata is the V.P. of Construction and he would show me areas in Jackson that were identified as desirable locations. I informed both Mr. Fricke and Mr. Cammorata that I had to have a space that a developer could build out for me ideally in a retail plaza, as I did not want to learn two new businesses namely construction and child care. Regardless of what I said to these two gentlemen Mr. Cammorata proceeded on our only site search to show me vacant lots, which would need construction of free standing buildings. Again

I told Mr. Cammorata this is what I specifically said I did not want. This site tour lasted about 2 hours and yielded no results. It was not thorough and contrary to my requirements, it was merely doing a minimum and going through the motions with no intent to assist in any way. In about October 2006 I find a site in Jackson that is a retail plaza and with a big sign advertising build to suit. Keep in mind I live 75 miles away and have no knowledge of Jackson or the area. I inform Mr. Cammorata of this site. I hear nothing back from either gentleman for 3 to 5 days. Meanwhile I begin a preliminary discussion with the developer. After the 3 to 5 day time period I am called up by Mr. Fricke and told not to continue negotiation because KADF had a commercial real estate agent with listing rights to the site I found.  The agent/broker was Mr. Harold Wien Real Estate LLC, Manasquan, NJ. I met Mr. Wien at the developer's site, Mr. Wien chatted casually with the developer, and left, we had no discussion or listing agreement between Mr. Wien and me. I was informed by the developer that Mr. Wien was entitled to a $ 200,000.00 +/- real estate commission based on that 4 minute chat. KADF failed in this instance to assist in finding a location, as promised, and breached the contract. Beyond that if KADF had done research in Ocean County, and specifically Jackson, why was I never shown this site? Why would KADF be concerned and go to the extreme of sending a broker in after the fact. There must be a rebate involved for KADF to be so concerned. I have subpoenaed any real estate listings KADF had with that broker in that area. After signing the lease Mr. Fricke again called and told me another franchisee had the rights to that location and I could not have it. I asked for the franchise agreement and again proof of the statement. I heard nothing for several days and when I called Mr. Fricke he informed me the executive committee, (Michael Miller CEO, William Enders COO and

Sue Wise CFO) was meeting to resolve the controversy and would decide if I could have the site. Mr. Fricke called me back some time later and informed me the committee had "awarded" me the location. This is breach of contract to assist in site location, unjust enrichment as KADF is benefitting from the injection of Mr., Wien ,after the fact, and generating a profit for themselves. Mr. Fricke, Mr. Cammorata and KADF have promised to assist in lease negotiation. Again they failed to do so as promised and I suffered great financial harm as a result of that failure. Specifically Mr. Fricke and Mr. Cammorata were on a conference call with me, the developer, Vito Cardinale, and the general contractor, Doug DeSandola for lease negotiation. I raise a question about a clause in the lease that calls for fees for "other connections". I ask what that refers to as I have no experience or idea. The developer and GC say its for a water connection. Mr. Fricke and Mr. Cammorata are on the conference call, this is not conjecture but fact, they are the experts having established child care centers all over the country, in every venue, and having done this dozens of times, and are there to assist in the lease negotiation. When I ask the connection fee Mr. DeSandola states it is around $5000.00. At that point Mr. Fricke and Mr. Cammorata should ask for a cap on the fee of that amount, or advise me to call the township and find out the fee, or point out to Mr. DeSandola that the KADF construction spec's require the developer to obtain a C of O and hence must have water service, I don't know about any of this and am relying on the two professionals to provide guidance and advice. I am a novice and intentionally purchased a franchise to avoid all the pitfalls a layman would encounter. The water connection fee was $ 34,500.00, and the proper subject of negotiation, by the two experienced professionals I was relying on for help in this matter. It is within the scope of their business to know

these issues; Mr. Cammorat was a developer, and Mr. Fricke the real estate professional.

I believed KADF was going to provide invaluable support in these matters, site location, and lease negotiation as promised at the KADF discovery day, where all the executives are gathered and promise excellence in all phases of operating the franchise. Mr. Cammorata also is the construction supervisor at KADF. In one instance I was having a camera system installed that I had purchased from KADF's preferred vendor. Mr. Cammorata supervises the construction of the academy's including mine. I call Mr. Cammorata when the electrical contractors are installing the wiring, the walls are open, and the camera system wiring should be installed. I was trying to avoid the mistakes of the water connection debacle. Mr. Cammorata states he will call the vendor. Mr. Cammorata calls me back and states the "camera system installation is done after everyone is done working in the building". When the camera system installer arrives he asks me why didn't I call him when the electrical was going in and the walls were open, now it will cost me $ 5000.00 +/- additionally. I inform Mr. Cammorata and he says he is sorry there must have been a mix up. Again the promise of assistance is not evident. I am paying and losing money on items I believed the franchisor was professional and expert in. I was injured financially by the acts and omissions of KADF, in failing to provide the support promised.

Exhibit D

B) KADF, SUSAN WISE CFO, BILL ENDERS COO, and Michael Miller
   CEO all intentionally did fraudulently obtain an SBA loan aided and
   abetted by Mr. Mark Moreno Sr. Regional Account Manager for CIT
   Small Business Lending. Background: I am contacted by Susan Wise,
   CFO, after I inquire about purchasing a franchise. Ms. Wise and all the

executives and Mr. Moreno are considered by the tenets of law to have

"implied knowledge, and courts have held them strictly responsible where

the special situation or their means of knowledge were such as to their

duty to know the truth or falsity of their representation", (business law ch.

3 c. Knowledge of falsity: intention to deceive. The quote continues "the

superior knowledge of the seller is usually apparent". The significance of

this in my case is that the earnings claims were grossly exaggerated. Those

claims, evidenced in the pro forma, prepared exclusively by Ms. Wise

with the advice and consent of Mr. Enders and MR. Miller, were

*Exhibit E*

fraudulent as they were inaccurate by 400% or more. The pro forma is

prepared by Ms. Wise and along with the KADF provided business plan

form the basis of the SBA loan application. The attached pro forma shows

a steady increase of revenue. On the current KADF website prospective

franchisees are influenced by average earnings claims of $ 276,119.00

*Exhibit C*

annual profit, and that" your financial goals could be within reach" In the

pro forma for my center Ms. Wise assumes two months free rent, I tell Ms.

Wise I will not get two months free rent but Ms. Wise inserts the falsity

anyway. Ms. Wise knows there is no free rent, hence it is a

misrepresentation being submitted to obtain an SBA loan. Ms Wise with

the advice and consent of Mr. Enders COO and Mr. Miller CEO,

misrepresents the earnings. Ms. Wise states that there will be 30

enrollments and $ 30,137.00 revenue the first month. Ms. Wise et.al. are

again missrepresenting a material fact, Ms. Wise's enrollment shows only

full time students, or FTE's in the KADF parlance. I submit to the court
every school is a mixture of full and part time and thus this is a direct
misstatement of fact and used to falsely exaggerate the income of the
school. Again, Ms. Wise is considered an expert as she is not a salesperson
but the CFO, and therefore the facts are peculiarly within the knowledge
of the seller, ( Bus. Law: Reality of Consent). Business Law in Reality of
Consent continues " It is the opinion of one holding themselves out as
having expert knowledge, and the tendency is to grant relief to those who
reasonably rely upon such expert evaluation in taking action". I relied
throughout the franchise process on the knowledge of the CFO, COO, and
CEO. The CFO is charged with all the financial matters concerning the
company. The CFO knows how new franchises ramp up because of this
expert knowledge. After the first month I had (1) one FTE and $309.00 in
revenue as opposed to the KADF pro forma of $ 30,137.00 in revenue. In
the eighth month of operation the document prepared by KADF et.al., and
submitted to the SBA for loan purposes, shows the bank and me, 87 full
time students and $ 90,865.00 in revenue. The actual figures are 27 full
time students and $23,879.00 in revenue. The expenses for the first month
are, according to the pro forma  $ 39937.00 the actual income $ 309.00.
These numbers are false and a deliberate misrepresentation and fraud. The
pro forma is used to obtain the SBA loan, the repayment of which is
dependent on the truth and accuracy of the CFO's earnings statements.
The rent, payroll, and all other expenses are likewise dependent. The fact

*Exhibit F*

that these amounts are false, contrived, and fraudulent directly cause the loss of 1.2 million personally to me, mostly from borrowing from family and friends, the loss of the pro forma income represented of $49409.00 per month, over the remaining 12 years of the agreement for a total of $7,114,869.00 in lost income. In reality I am in bankruptcy Court, owing approximately, $475000.00 to CIT Small Business Lending, $300,000.00 to the landlord and $800,000.00 to family and friends. Similarly the working capital required was incorrect by 800%. As you look at the financial document prepared by Ms. Wise with the advice and consent of the COO and CEO, it does show a working capital requirement of $125,000.00. As you proceed along the pro forma it states in the ninth month I breal even, make a small profit and that there is money left over from the working capital. I never exhaust the working capital. Again a misrepresentation, as I contribute another $ 800,000.00 towards working capital. Hence the figures are misrepresented at over 800%. The securities Exchange Act of 1934, and rule 10 b 5 "specifically prohibits making any false statements or omissions in connection with the sale or purchase of a security. The fact that KADF is a security is established by the case law cited, and the fact KADF files Bankruptcy with the SEC in 1998, case # 0-27284. These co conspirators posses expert knowledge, and in my case I am not dealing with the promises of rank and file sales persons but rather with the experts, CFO, CEO, COO, and the Sr. Account manager at CIT. I inform Ms. Wise I have just recently gotten divorced and I am not

convinced I can afford the purchase of a franchise at this time. I inform Ms. Wise I have a 500 credit score, that I've lost my job as my place of business has closed, and I have no assets. I inform Ms. Wise I will revisit the project at a later date perhaps after I sell my house. Ms. Wise, in a series of phone calls over several days elicits information from me. Can someone co-sign for me, does someone else have an asset they can pledge, very high pressure tactics and an undue influence. Ms. Wise then asks about my daughter, Lauren A. Meade, and inquires about her credit worthiness. I guess at her score of about 620. Ms. Wise states she will put my daughter's name on the application. I scoff and tell Ms. Wise my daughter is 21 years old a Rutgers College student and she works part time at Lens Crafters. Ms. Wise now insists she can secure a $ 475000.00 SBA loan and get me into business for free. Again high pressure, undue influences, thereby causing me to do something I would not do without the exhortations. I still am resistant and inform Ms. Wise I am the only person on the incorporation articles. Ms. Wise states not to be concerned with that she works all the time with Mr. Mark Moreno of CIT Small Business Lending and they have gotten people with worse credit histories approved and they do this all the time. I ask Ms. Wise directly is this legal, she states yes its standard operating procedure and this is the help we at KADF give to our franchisees and CIT and KADF have a long standing relationship and it would be no problem. Ms. Wise proceeds to prepare the pro forma; this is the statement of the revenue I can expect. This pro forma

Exhibit G

is the basis for the SBA loan. This pro forma is fraudulent and hence violated the SBA Office of Attorney General Guidelines on preventing and detecting fraud in SBA loans. The SBA specifically prohibits concealing the true credit worthiness of the loan applicant, also concealing the true ownership of the business. Ms. Wise with the advice and consent of Mr. Enders and MR. Miller conspire to create a "strawbuyer" and perpetrate fraud on another government agency the SBA. Not only am I directly economically injured, that injury is directly traceable to the defendants, and can be remedied by the court, but additionally, in my opinion federal crimes have been committed, that are punishable under law with both fines and prison sentences. It is my opinion KADF's charter should be revoked and the remaining schools turned over to the current owners. To allow this conduct to go unpunished allows the perpetuation of financial ruin to spread to other hard working people who are trying to create a better life. There is a moral imperative to stop this fraudulent conduct and punish the architects thereof.

III) To establish the veracity of my claims we need only look at the ponderous amount of legislation enacted to combat these activities. We need only look at the prohibitions of the SBA, FTC, N.J. Franchise Practices Act, N.J. Consumer Fraud ACT, the Acts of the majority of States, all battling these franchise practices. All of this rulemaking and legislation is a reaction to the prevalence of these nefarious practices. When a case comes before the court, raising the same issues the law has sought to eradicate it is in the "Public

Interest" to hear the case, to err on the side of caution and prudence, to consider the complaint as true and substantial, and a sase and controversy, between citizens of different states, that involves violation of federal law, and legislative statutes that the court was specifically created to hear.

IIII) Your Honor I can go on ad infinitum. This is the case I wish to present to the court and a jury. I will abide by the decision that is made after, discovery and a trial. I issued a subpoena through the Bankruptcy Court to CIT Small Business Lending, and Mark Moreno, Sr. Account Manager, on Feb. 4th, 2011, due on Feb.18th, 2011. There was a request by CIT counsel for an extension to Mar. 25th, 2011 which I granted but as of Apr. 7th 2011, no documents have been produced. I also attempted to issue KADF et. al. a subpoenas but after several weeks was told by my bankruptcy attorney that they had to have an office within 100 miles to serve KADF. I subsequently filed a subpoena with the court serving KADF et.al.

*Exhibit H*

*Exhibit I*

*Exhibit J*

A) Failure to provide assistance after opening:

1) Carolyn Novack was my FBC, franchise business consultant. She was to provide the initial training to my staff as promised. This training consisted of a one hour and forty minute discussion of general principles with my staff. I was in attendance. At the conclusion of this brief session, pre-printed "certificates" were issued and Ms. Novack began to leave. I protested as I wanted the promised assistance of KADF being there with me during the initial opening, whether it was for one full week or more KADF had promised I would get the training I needed. I asked Ms.

Novack to demonstrate the Kiddie Academy proprietary center based learning, that distinguished them from all the competitors, she refused, and left. She stated I don't have enough kids and it would be a waste of her time, and that she would return, I never saw her again. Ms. Novack left the company. I was left on my own, to learn the new business, again I purchased the franchise to get help, to have the experience of professionals, to be trained and mentored, this was another breach of contract. My next FBC, was David Brooke. I asked Mr. Brooke about his qualifications. He stated he worked at "Domino's Pizza". I aked what position he held there, but never received an answer. Mr. Brooke had never worked in child care, and yet I was to depend on him to provide the thorough and expert advice promises by KADF. This is inadequate and deceptive. I am getting people with no experience in the franchisors' field. Similarly at the two week training Ms. Leslie Coleman is the instructor, it was her first week, so we had to "bear with her" as she learned. Referring to Mr. Brooke again, he visited the school on another occasion. I had designed signs for my classrooms with one of my parents that was in the sign business. Mr. Brooke asked to meet her, I introduced them. Mr. Brooke left and then contacted the parent to solicit if she would make those signs for the entire KADF system. KADF is bound by contract to assist me in all phases of the operation of the franchise. But rather KADF is using me to design their interior signs. Again Mr. Brooke asked me if he could use my director's telephone technique in their training class, and

again after I made a TV commercial, Mr. Brooke asked for and was given a copy and KADF produced there own TV commercial, that they claim has aired, the point being KADF is demonstrating the inability to assist in advertising. Further proof was back in the training, incidently, Ms. Wise CFO is there for much of the training as it relates to selling the "preferred vendors", as is Mr. Enders COO, and Mr. Miller CEO. Their purpose is to sell vendors, not train new business people, again a misrepresentation. In fact Ms. Wise instructs the new owners to fill out a preliminary insurance form. Markell is the insurance company, Scott McAdams, the representative. They are both present, I constantly question Ms. Wise about the price points of all of her vendor's, I question Mr. Enders and Mr. Miller as well, I am repeatedly deceived by their answers. Specifically on the insurance, with the representative present. Ms. Wise answers to perpetuate the fraud and rebate scheme, she states, there are only three insurance companies in the country that will insure child care centers and Markell is the least expensive. Again not true as I have switched insurers, and have reduced my cost by 40%. To a new franchisee that is relying on the good will and fair dealing of the franchisor I am susceptible to such machinations and being taken advantage of by the franchisor who seeks to line its own pocket with blatant disregard for the welfare of the franchisee. To continue I fill out the form as instructed by Ms. Wise, and list the center capacity at 174. The representative takes this form and leaves. Mr. McAdam subsequently calls me up and asks if I am interested in having

insurance for the school, I am. I send money and several months later discover I am insured for 174 students, my coverage began in Mar. 2007, five months before I open, and my premium is over $10,000.00. When I protest to Ms. Wise, Mr. Enders and Mr. Miller, Ms. Wise stalls, there are several phone call expressing disbelief on KADF's part, and then I am again apologized to and told again there must have been a mix up. I demand a refund as I only have 20 students average for the whole year and again, stalling, assurances that this matter will be looked into and as the end result, nothing can be done. This happens with every preferred vendor, the same scenario. I can give more examples and reserve the right to present it and testimony at trial.

IV) I respectfully request this case be allowed to proceed. I have standing, KADF has indicated it was never seeking arbitration, the CIT loan does indeed show I get into business for free, as I swear, Ms. Wise stated, the pro forma is a misrepresentation, the pro forma is fraudulent inducement to enter into the franchise agreement, the SBA loan is acquired and dependant on the fraudulent pro forma, my daughter is listed as the owner by Ms. Wise with the advice and consent of Mr. Enders COO and Mr. Miller CEO, the corporation is in my name alone, KADF has this document, and prepares all of the financial pro forma information and the loan application, attests to its legality and then presents it for signature, it is all done in house. I am not familiar with conspiracy/RICOH laws, but will research them and reserve the right to add them as it appears to a reasonable person KADf's actions are deliberate,

coordinated, and intended to defraud and deceive. All contracts assume "GOOD FAITH and FAIR DEALING" KADF's agreement is devoid of this. This is a pattern of deception and intent to defraud franchisees. As recently as April 2nd, 2011, KADF negotiated and was remunerated for brokering the sale of 22 Kiddie Academys' in New Jersey. This reduced the number of academy's from 37 to just 14. This constitutes a "Moral Hazard" as KADf et.al. has acted in its own best interest to the detriment of the remaining franchisees, good faith and fair dealing preclude conduct that diminishes the fair chance to obtain the benefit of the bargain, it protects reasonable expectations, and requires the franchisor to act fairly and honestly. In this case the sale was done in secret, with still no announcement. The sale was made to BRIGTt HORIZONS , a worldwide child care provider to corporations and institutions. This is their first venture into localized child care and hence KADF et.al. has introduced an entirely new competitor into the mix. KADF claims they have 100 schools, through closings of 7 schools and by negotiating the sale of these 22 schools they have reduced the presence by approximately 30% and harmed the franchisees. Again a pattern of bad conduct. I have met with the officers and directors of KADF to establish mutual grounds to negotiate, on Apr. 16th 2010 and again on Feb. 25th, 2011. I drive the 375 mile round trip but instead of negotiating I am threatened by Mr. Miller with a lawsuit, I am told by Mr. Miller all the other schools are doing great and that I am the only one struggling. I have first hand knowledge that that is a false statement. At the Feb. 25th meeting I meet Mr. Greg Helwig,

Director of development, and Mr. Enders. COO, again I am threatened as the lawsuit has already been filed. They were mocking me and laughing at me. When I mentioned I would get a job to keep my school open, Mr. Helwig again threatened me stating, I would not be able to hold a job because he personally would see to it that I was buried in so many suits and motions I would not have time to hold a job. Indeed I took a job and had to quit as I was buried with motions and suits. I have inquired about the costs of hiring counsel, or hiring counsel on a contingency basis but to no avail. The costs are $50,000.00 for a retainer and then probably another $200,000.00 to $300,000.00 after that. I cannot afford that, but cannot afford not to pursue this lawsuit. It is my understanding, anecdotally, Mr. Enders COO and Ms. Wise CFO have been fired recently.

CONCLUSION'

I ask the court with all due respect to allow this case to proceed and deny the defendant's motion for dismissal. All of the above is true to the best of my knowledge and I do so swear.

Mark C. Meade 4/07/11          Pro Se Plaintiff